EJK:SK
F.#2013R01878

**14 M ...**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - --X

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH WHATSAPP MESSENGER ACCOUNTS ASSOCIATED WITH THE FOLLOWING TELEPHONE NUMBERS:<br><br>(1) (908) 937-6962<br>(2) (592) 691-4479<br><br>AND THE FOLLOWING IMEI NUMBER:<br><br>(3) 013647004306885<br><br>THAT IS STORED AT PREMISES CONTROLLED BY WHATSAPP | TO BE FILED UNDER SEAL<br><br>AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT<br><br>(T. 21, U.S.C., §§ 841(a)(1) and 952(a)) |

- - - - - - - - - - - - - --X
EASTERN DISTRICT OF NEW YORK, SS:

      I, CHRISTOPHER McKELVY, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

      1.    I make this affidavit in support of an application for a search warrant for information associated with WhatsApp Messenger ("WhatsApp") accounts associated with: (1) the telephone number (908) 937-6962 (the "LG Telephone Number") and associated IMEI number 013647004306885 (collectively, the "Courier's Numbers"); and (2) (592) 691-4479 (the "Supplier's Number").

      2.    I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been a Special Agent with HSI for

1

approximately 5 years. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal narcotics offenses and narcotics trafficking into the United States. These investigations are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. In the course of my training and experience, I have become familiar with the use of computers, social media, email and the internet in connection with criminal activity.

3. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from my own observations, reports made to me by other law enforcement officers, and review of records from HSI and other government agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of the following: (1) Title 21, United States Code, Section 952(a), importation of a controlled substance into the United States from a place outside thereof; (2) Title 21, United States Code, Section 963, conspiracy to import a controlled substance into the United States from a place outside thereof; (3) Title 21, United States Code, Section 841(a)(1), possession with intent to distribute a controlled substance; (4)

Title 21, United States Code, Section 846, attempt or conspiracy to possess with intent to distribute a controlled substance, have been committed by known and unknown persons.

5. With respect to the Courier's Numbers and the Supplier's Number, there is probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

A. <u>Background on Narcotics Conspiracy</u>

6. HSI along with the United States Attorney's Office for the Eastern District of New York have been conducting an investigation into the unlawful possession with intent to distribute narcotics and importation of narcotics.

7. On or about November 6, 2013, Christina Cordova (the "Courier") arrived at John F. Kennedy International Airport ("JFK") aboard Caribbean Airlines Flight No. 520 from Port of Spain, Trinidad.

8. After the Courier's arrival, United States Customs and Border Protection ("CBP") officers selected the Courier for an enforcement examination. The Courier presented a green suitcase and two yellow carry-on bags for inspection (collectively, the "Luggage"). The Courier informed CBP officers, in sum and substance and relevant part, that the Luggage and everything within it belonged to the Courier, that the Courier had purchased all of the items in the Luggage, and that the Courier had packed the Luggage herself.

9. In the Luggage, CBP officers found eight boxes marked as containing Tortuga Caribbean Rum Cakes (the "Boxes"). CBP officers probed the cake inside one of the Boxes and discovered a white powdery substance. The white powdery substance field-tested positive for cocaine. CBP officers also discovered a white powdery substance concealed in

3

each of the other Boxes. Law enforcement officers recovered a total gross weight of approximately 3,675.6 grams of cocaine from the Boxes.

10. The Courier was arrested. The Courier was read her Miranda rights and invoked her right to counsel. Subsequently, the Courier expressed that she wanted to speak to law enforcement officers. The Courier was re-read her Miranda rights; she waived those rights and agreed to speak with law enforcement officers without an attorney present. In post-arrest statements, the Courier stated, in sum and substance and relevant part, that: the Courier wanted to go on vacation and consulted a co-worker in Elizabeth, New Jersey (the "Recruiter") about possible destinations; the Recruiter suggested that the Courier go to Trinidad and informed the Courier that she (the Recruiter) had a friend in Trinidad (the "Supplier") who could facilitate the Courier's trip; the Courier paid for the trip and her hotel using her credit card; and upon arrival, the Courier met with the Supplier, who picked the Courier up from the airport, took her to the hotel, and took her around shopping and elsewhere. The Courier further stated, in sum and substance and relevant part, that: the Courier bought the Boxes at a store; the Courier packed the Boxes in the Luggage; and the Supplier gave the Courier the number of an individual in New York (the "Pick-Up Guy") who could pick the Courier up once she returned to New York and if she needed a ride home.

11. Subsequently, the Courier stated that she wished to speak with law enforcement officers again. The Courier stated, in sum and substance and relevant part, that: the Recruiter told the Courier that the Courier could earn $3000 for bringing gold into the United States from Trinidad; the Recruiter told the Courier that she (the Recruiter) had taken trips for the Supplier before; the Courier paid for her airplane ticket to Trinidad on Thursday (October 31, 2013, two days prior to departure) with money that the Supplier had sent her via

Western Union; the Supplier paid for the Courier's hotel in Trinidad; the Supplier gave the Courier the Boxes on the night before she left Trinidad (the Courier did not buy them); the Supplier told the Courier that the Boxes contained Guyana gold that the Supplier wanted to smuggle into the United States; the Courier asked the Supplier if the Boxes contained drugs and the Supplier responded that they did not contain drugs, just gold; and the Supplier instructed the Courier to call the Pick-Up Guy upon arrival in New York and informed the Courier that the Pick-Up Guy would pick up the Courier and take the Boxes from her.

12. At the time of the enforcement examination, the Courier had the cellular telephone associated with the Courier's Numbers in her possession. A search of the foregoing cellular telephone revealed:

a. the Supplier's Number, as well as telephone numbers for the Recruiter (the "Recruiter's Number") and the Pick-Up Guy (the "Pick-Up Guy's Number") among the list of phone contacts;

b. a photograph of a business card for a hotel in Trinidad containing the hotel's telephone numbers and email address;

c. two outgoing telephone calls made on the morning of November 6, 2013, shortly after the Courier's arrival at JFK;

d. a WhatsApp text message conversation dated October 31, 2013, referencing Western Union payment information;

e. a photograph taken on November 1, 2013, of a WhatsApp text message from the Courier to the Supplier stating "Ok cool";

5

        f.      photographs taken on November 4, 2013, of flight itineraries and airfares for various flights from Port of Spain, Trinidad to JFK departing on November 6-7, 2013;

        g.      an unsent outgoing text message to the Pick-Up Guy dated November 6, 2013, stating "Just got off the plane."

        13.      On December 2, 2013, a grand jury in the Eastern District of New York returned an indictment charging the Courier with one count of importation of cocaine (in violation of 21 U.S.C. § 952(a)) and one count of possession of cocaine with intent to distribute (in violation of 21 U.S.C. § 841(a)(1)).

        14.      Based on my training and experience and discussions with other law enforcement officers, I know that individuals involved in the importation and possession with intent to distribute narcotics often do not act alone and often communicate with coconspirators by means of cellular telephones, email, social media, cross platform mobile-messaging applications and the internet. Review of the Courier's cellular telephone confirmed that the Courier and her co-conspirators utilized cellular telephones and WhatsApp for purposes of communication.

        15.      Additionally, mobile telephone provider MetroPCS provided HSI with call detail records for the Recruiter's Number. Review of the foregoing call detail records revealed multiple contacts between the Recruiter's Number and the Courier's Number before and after the Courier's trip to Trinidad. Specifically, the Recruiter and Courier exchanged calls on or about October 12, October 19, October 26, October 31, November 1, and November 7, 2013.

B.  WhatsApp Messenger

16.  According to the WhatsApp website, WhatsApp is a cross-platform mobile messaging application which allows a user to exchange messages without having to pay service fees for use. WhatsApp is available for use as an application on an iPhone, BlackBerry, Android, Windows-based or Nokia telephone. WhatsApp does not use traditional cellular or wire communication lines for communications, but instead relies on internet access for communication. Users are required to subscribe to WhatsApp by using their mobile phone number and they are able to operate the application in a manner consistent with traditional mobile telephone use. Upon subscription, the WhatsApp Messenger confirms subscription by transmitting a message to the subscriber's telephone number.

17.  Specifically, the WhatsApp application allows its subscribers to communicate with other subscribers to the application or with subscribers to related third-party applications and websites using the following features: (1) instant messaging, (2) text, picture, video, and audio media messaging, (3) group chat; (4) status updates; and (5) geolocation sharing.

18.  Review of the Courier's cellular telephone indicates that the Courier's Numbers and the Supplier's Number have accounts with WhatsApp and that they were active as recently as November 1, 2013.

19.  Given that the Courier's Numbers have active accounts with WhatsApp, the computers of WhatsApp are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of WhatsApp, such as account access information, transaction information, and other account information.

7

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

20. With respect to the Courier's Numbers and the Supplier's Number, I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require WhatsApp to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

21. Based on the forgoing, I request that the Court issue the proposed search warrant.

22. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

23. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

## REQUEST FOR SEALING

24. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Dated: Brooklyn, New York
      January 24, 2014

Christopher McKelvy
Special Agent, HSI

Sworn to before me this
24th day of January, 2014

THE H_____
UNITED _____ JUDGE
EASTERN DISTRICT OF NEW YORK